IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH STAFFORD, an individual, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UNITED TREASURES, INC., a )<br>Washington corporation, )<br>)<br>Defendant. )<br>_____) | CIV. S-04-47 GEB PAN<br><br><br><br><br>ORDER |

Pending are cross motions for summary judgment or for summary adjudication.  The motions were heard April 18, 2005.  At this hearing, the parties agreed that no genuine issues of material fact exist preventing decision on the liability issues involved in the motions.  Therefore, each party was requested to file a prevailing party proposed order.  On May 2, 2005, proposed orders were filed, and responses thereto were filed on May 9, 2005.

The pending motions involve copyright, trademark and issues arising out of an alleged breach of a licensing agreement.  The following facts are undisputed.[1]

---

[1] Local Rule 56-260 obligates the parties to "cite the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission or other document relied upon to
(continued...)

1

     1.   Keith Stafford ("Stafford") and United Treasures, Inc. ("UTI") entered a license agreement dated August 1, 1999.

\*\*\*

    15.  Following the execution of the License Agreement, Stafford submitted two-dimensional artwork to UTI to use to make polyresin figurines.

\*\*\*

    18.  Stafford in fact exercised control and approval over the quality of the GOODS during the process of developing them.

    19.  Stafford came up with the name ANGELS OF INSPIRATION and instructed UTI on the proper trademark to use.

    20.  UTI's own agents and representatives have admitted they understood Stafford was the owner of the trademark ANGELS OF INSPIRATION.

\*\*\*

    22.  On or about September 28, 2001 United Treasures filed an application for, and ultimately obtained, federal registration of the mark ANGELS OF INSPIRATION.

\*\*\*

    24.  The name of Keith Stafford and Stafford's Ethnic Collectibles was prominently and regularly featured in United Treasures' advertisements for ANGELS OF INSPIRATION.

    25.  The label attached that was originally attached by United Treasures to its angel figurines said "Angels of Inspiration by Keith Stafford" and continued to do so until 2004.

\*\*\*

---

[1](...continued) establish [a] fact" asserted to be undisputed or disputed. Although UTI asserts Stafford's Undisputed Facts Nos. 15, 17, 18, 20, and 33 are disputed, UTI's evidence and argument do not constitute specific facts establishing a genuine issue of material dispute as to any of these facts.

2

> 28. Stafford owns the copyrights in the two-dimensional artwork for Kente Claus and the Angels of Inspiration that was submitted to UTI in 1999.
>
> 29. Stafford obtained federal registration of his COPYRIGHTS in (a) the 2-dimensional artwork he submitted to United Treasures, (b) the figurines that UTI had made reproducing his artwork, and (c) the 2-dimensional artwork for the second series of angels in 2001.
>
> ***
>
> 32. From the first sale of the figurines until 2004 the only copyright used by United Treasures on the figurines themselves was ©1999 Keith & Shereen Stafford.
>
> 33. During the process of developing figurines, Stafford was intimately involved in review of sculptural changes and in providing specific design suggestions over the telephone with Colleen Melott.
>
> ***
>
> 45. Stafford owns the copyright in the two-dimensional artwork for the Angels of Inspiration and Kente Claus, which were submitted to UTI and upon which the UTI figurines were based.
>
> 46. Stafford has registered his copyrights in the two-dimensional artwork he submitted and in the finished figurines for the original seven angels, and in just the two-dimensional artwork for the second series of three angels.

(Def.'s Resp. to Pl.'s Separate Statement of Undisputed Material Facts in Supp. of Mot. for Summ. Adjudication.)

## BACKGROUND[2]

Plaintiff Keith Stafford began making ethnic figurines and artwork in 1994, when he started the business Stafford's Ethnic Collectibles with his wife, Shereen.  Beginning in 1994 Stafford sold a line of African angel dolls, and his sales grew.  In 1995, Stafford

---

[2] This background is substantially quoted from Plaintiff's Proposed Order on Motions for Summary Judgment filed May 2, 2005. Except as otherwise indicated, no genuine issue of material fact exists as to the facts stated in this Order.

3

developed the figure of Kente Claus, an African Santa Claus ornament. Stafford ultimately developed, and through a series of license relationships, marketed and sold, a series of products based upon his angel and Kente Claus designs.

In early 1999 Stafford's agent, Anmarie Linsley, owner of an agency firm, Public Image Consultants, met representatives of UTI at a trade show in Los Angeles, California. They saw samples of Stafford's work and expressed interest in negotiating a license deal for his work. Linsley sent one of the representatives, Matt Lord, a confirming letter. Thereafter, the parties negotiated the terms of a license agreement ("Licensing Agreement"), pursuant to which UTI would manufacture and sell polyresin figurines based upon artwork provided by Stafford. At the time the Licensing Agreement was entered, the artwork upon which the polyresin figurines were to be based did not exist. In July 1999 Stafford entered a work for hire agreement with an illustrator named Thomas Blackshear, who was to prepare illustrations to submit to UTI based upon Stafford's Kente Claus figure. Blackshear prepared artwork, and Stafford submitted it to UTI. Stafford also retained another artist named Robert Grist, who, under the terms of a work made for hire agreement, prepared illustrations for seven African angel figurines based upon Stafford's recommendations. There is some dispute about exactly what artwork Stafford provided to UTI after executing the Licensing Agreement. Stafford testified that in the fall of 1999 he submitted to UTI two-dimensional line drawings and color artwork for seven angel figurines, which Stafford had individually named Joy, Unity, Peace, Happiness, Love, Faith, and Mercy. UTI admits Stafford submitted

two-dimensional artwork that was used to make the figurines, but its account is somewhat different.

After Stafford submitted his artwork, UTI, working with artists located in China, manufactured eight painted polyresin figurines, seven of which were based upon Stafford's Joy, Unity, Peace, Happiness, Love, Faith, and Mercy designs, and one of which was based upon his Kente Claus design. Photographs of these were e-mailed to UTI's customer service representative, Colleen Melott, and to Stafford. Melott and Stafford then talked on the telephone to discuss changes to be made to the figurines. Melott was Stafford's main contact for UTI for the development of the figurines. Melott sought Stafford's approval on changes and design recommendations.

Although the parties dispute some of the details and the legal consequences of their respective contributions to the development of the figurines following the submission of Stafford's two-dimensional artwork, the crucial material facts concerning the development of the figurines are undisputed: first, Stafford contributed copyrightable artwork in the form of two-dimensional illustrations and line drawings for the express purpose of incorporating the artwork into three-dimensional figurines; second, Stafford was involved, through telephone conversations with Colleen Melott, in reviewing, proposing, and authorizing changes to the color and form of the figurines during the sculpting process; and, third, UTI was contractually obligated to seek Stafford's approval, and throughout the development process did seek and obtain Stafford's approval, for the design of the figurines.

As was required of UTI under the terms of the Licensing Agreement, UTI sought and obtained Stafford's approval for the

5

specific form of the copyright notice to be placed on the figurines. Stafford authorized the notice "© 1999 Keith & Shereen Stafford," and the parties do not dispute that this was the sole copyright notice used on the figurines until 2004.

During the development process Stafford also came up with the trademark ANGELS OF INSPIRATION, and he authorized this mark to be used in connection with the angels. UTI also sought and obtained, by letter from Lord, Stafford's approval concerning the form of the trademark notice for KENTE CLAUS.

The figurines began being sold in 2000. From the beginning a hang tag was placed on the figurines that said "ANGELS OF INSPIRATION by Keith Stafford." Throughout 2000 and beyond UTI consistently advertised Stafford as the copyright owner of the figurines and consistently featured Stafford's name in connection with the ANGELS OF INSPIRATION mark. The parties agree that this first commercial use of the mark ANGELS OF INSPIRATION was by UTI.

In 2001 Stafford and UTI began working on an additional series of angel figurines to be sold under the ANGELS OF INSPIRATION mark. Their names were to be Blessed, Guidance, and Grace. Stafford and UTI began working on developing the figurines even before they had negotiated a new contract to cover them. As before, Stafford submitted two-dimensional artwork that had been prepared by an artist under a work for hire agreement. The parties negotiated the terms of a new contract to cover this new artwork, but ultimately the parties could not agree on the terms of a new contract.

In 2001 each of the parties, without informing the other, registered copyrights in the figurines. Stafford registered copyrights in the two-dimensional artwork for the original seven

Angels of Inspiration, in the original seven figurines themselves, and in the artwork and drawings for the second series of three angels. Meanwhile, UTI registered copyrights in the original seven figurines, and in the three additional figurines over which the parties had failed to execute a new contract. No agreement had ever been signed by Stafford and UTI giving UTI these copyrights. Further, UTI filed an application for the mark ANGELS OF INSPIRATION on September 28, 2001.

In 2002 Stafford entered an agreement with a company called Sarah's Attic, Inc. to make and sell figurines based upon new designs under the Angels of Inspiration name. The new angels – Worthy, Courage, Comfort, and Forgiveness – were based upon new illustrations provided by Stafford to Sarah's Attic. The parties do not dispute that these angels are not based upon the angels made under Stafford and UTI's Licensing Agreement. In addition, Stafford licensed Sarah's Attic to make four-inch Christmas figurines based upon four of the angel designs -- Joy, Love, Peace, and Unity – that Stafford had submitted to UTI in 1999 under the Licensing Agreement. Stafford also licensed Sarah's Attic to make three additional figures based upon the three angel designs -- Guidance, Blessed, and Grace – for which Stafford and UTI had failed to enter a new contract in 2002.

In April 2003 Stafford entered another license agreement with Perkins, Inc. to permit Perkins to take photographs of the Angels of Inspiration figurines being sold by UTI and to use the photographs in calendars. In December 2003 UTI sent Sarah's Attic and Perkins cease and desist letters and then sued them in federal court in the State of Washington.

1  The key issues to be resolved in the cross-motions for
2 partial summary judgment are the interpretation of the Licensing
3 Agreement and determination of which party owns the copyrights and
4 trademark.

## DISCUSSION

6  Each party contends that the Licensing Agreement is
7 unambiguous and that it entitles each party to claim ownership of the
8 polyresin figurines. Stafford asserts he licensed only a narrow right
9 to UTI to reproduce his artwork in a specified medium, and that this
10 did not convey a right to UTI which authorized it to own WORKS derived
11 from Stafford's artwork. UTI asserts that the Licensing Agreement
12 transferred more rights to it, arguing:

> When placed in context, and taking into
> consideration the language of the contract as a
> whole, it is clear that the instant Licensing
> Agreement conferred Stafford's right to create
> derivative works to UTI. While it is true that
> the word "reproduce" is found in the license's
> Grant Clause, and that the Grant Clause does not
> contain the phrase "derivative works," a plain
> reading of the contract demonstrates that the
> parties intended that UTI would use Stafford's
> two-dimensional sketches of angels to create new
> three-dimensional, color and more complete poly
> resin figurines. Since the two-dimensional
> sketches were transformed into both a different
> form of art and a more elaborate work of art, the
> figurines are derivative works as a matter of law.
>
> Specifically, as set forth above, the Licensing
> Agreement confers the exclusive right to UTI
> ". . . to reproduce the WORKS on the GOODS . . . "
> According to Schedule A found at page 8 of the
> Licensing Agreement, the "WORKS" include "Six
> Angel images . . .". According to Schedule B
> (also found at page 8 of the Agreement), the term
> "GOODS" means "Poly Resin Figurines". Taken
> together and inserted into the Grant Clause, that
> clause reads that UTI ". . . shall have the
> exclusive right . . . to reproduce the [Six Angel
> images] on the [Poly Resin Figurines].["]
> Accordingly, by its terms, the Licensing Agreement
> conferred to UTI the exclusive right to reproduce

8

>     the two-dimensional sketches of angels on three-
>     dimensional poly resin figurines.
>
>     Transference of the derivative work right to UTI
>     comports with the use of the word "reproduce" in
>     the Licensing Agreement.  By definition, a
>     derivative work requires that the creator of the
>     derivative work "reproduce" a substantial portion
>     of the original work in his or her new
>     creation[.][3]

(Def.'s Proposed Order on Cross-Motions for Summ. J. at 10-11.)

Stafford rejoins that "as the licensor he is entitled to ownership of the copyright, and UTI's rights are only those of a licensee." (Pl.'s Proposed Order on Cross-Motions for Summ. J. at 10.) Stafford also asserts that "under the terms of the License Agreement (specifically; paragraphs 3, 5, and 11), [UTI's] use [of the trademark Angels of Inspiration was] for the benefit of the licensor, or Stafford"; and therefore, he is "the proper owner of the mark." (Pl.'s Resp. to UTI's Proposed Order on Motions for Summ. J. at 7.)

The Licensing Agreement was formed in California and contains a choice-of-law clause which states that California law governs its interpretation. UTI argues that its federal registration of the "Angels of Inspiration" trademark is prima facie evidence of its ownership of the mark, and constitutes a presumption of ownership that can only be overcome by a showing that meets the preponderance of evidence standard. <u>Sengoku Works Ltd. v. RMC Int'l, Ltd.</u>, 96 F.3d 1217, 1220-21 (9th Cir. 1996). Similarly, UTI argues it is the copyright holder in the polyresin figurines under the first sale doctrine.

---

[3] At the April 18 hearing on the motion, UTI's counsel indicated that UTI's claim to derivative work was implied from language in the Licensing Agreement.

9

"[G]eneral principles of contract interpretation [are applied] when interpreting the terms and scope of a licensing agreement." Miller v. Glen Miller Productions, 318 F. Supp. 2d 923, 934 (C.D. Cal. 2004). "Summary judgment is appropriate when the contract terms are clear and unambiguous, even if the parties disagree as to their meaning. Interpretation of a contract is a matter of law, including whether the contract is ambiguous." United States v. King Features Entertainment, Inc., 843 F.2d 394, 398 (9th Cir. 1988)(citations omitted).

The Licensing Agreement states as its purpose that the

> LICENSOR . . . grant[s] LICENSEE the right to reproduce LICENSOR'S designs described at **Schedule A** attached hereto and any other designs which may later be added to **Schedule A** (WORKS) according to Paragraph 8 on the GOODS described at **Schedule B** attached hereto or any other GOODS which may be later added by mutual written agreement to **Schedule B** (GOODS) . . . and to use LICENSOR'S trademarks and or copyrights described at **Schedule C** (TRADEMARKS/COPYRIGHTS) on the GOODS incorporating reproductions of the WORKS.

Paragraph 8 states in pertinent part "Such new WORKS shall be subject to all the terms and conditions of this Agreement." Further, in the "Acknowledgments" and "Grant" sections of the License, the

> LICENSEE acknowledges and agrees that LICENSOR is the sole owner of all rights, in and to the WORKS now described in **Schedule A** and any new WORKS to be added to **Schedule A** by LICENSOR. LICENSEE acknowledges that said WORKS and each of them are the unique creations of LICENSOR and that the WORKS carry with them unique design elements which constitute a protectable trade dress for LICENSOR's products. Furthermore, LICENSEE acknowledges that the trademarks and COPYRIGHTS have become distinctive of LICENSOR'S GOODS throughout the TERRITORY and that the maintenance of quality of GOODS sold in connection with the TRADEMARKS and COPYRIGHTS is an important interest of LICENSOR . . . .

> . . . During the [license] TERM . . ., and provided that LICENSEE complies with all the term[s] and conditions hereof, LICENSEE shall have the exclusive right throughout the TERRITORY to reproduce the WORKS on the GOODS and to use the TRADEMARKS and COPYRIGHTS on such GOODS incorporating reproductions of the WORKS. Any and all rights in and to the WORKS and TRADEMARKS and COPYRIGHTS not expressly granted to the LICENSEE are hereby reserved by LICENSOR.

The "artwork" section of the license states in pertinent part the

> LICENSEE may not use this artwork for any purpose except to make reproductions of the WORKS on the GOODS for distribution in the TERRITORY during the TERM. Until such time as LICENSEE is obligated to return the artwork to LICENSOR as mentioned above, LICENSEE shall keep such artwork in a safe and secure place and ensure that the same is not made available to any other person for any purpose. LICENSEE agrees not to reproduce the artwork to the WORKS except during the TERM and under the terms and conditions specified hereunder.

The "Quality Control" section of the license states in pertinent part the

> LICENSEE shall use the TRADEMARKS and or COPYRIGHTS on the GOODS as prescribed in writing by LICENSOR, including any statutory or other notice or symbol of trademark registration. LICENSEE shall use LICENSOR'S copyright notices, as prescribed by LICENSOR, on all reproductions of the WORKS as described at Schedule A shall be "©1999 Keith and Shereen Stafford" such dates for each of the WORKS being determined by first production run.

Lastly, the Licensing Agreement contains an integration clause providing that:

> This Agreement represents the complete understanding between the parties as to its subject matter and supersedes all prior understandings, if any, as to its subject matter. No modification or amendment, nor any promise, waiver or representation (past, present or future) shall be valid or binding unless made in writing and signed by the party to be bound thereby.

1             The language in the Licensing Agreement is unambiguous.  UTI
2    acquired the right to reproduce Stafford's artwork, but Stafford
3    retained all ownership rights.  In the context of the parties' entire
4    agreement, it is clear that the "right of reproduction" was not
5    intended to convey to UTI any ownership right in any of the works
6    created under the Licensing Agreement; all ownership rights in the
7    works, trademarks, and copyrights were "reserved by" Stafford.  The
8    literal language of the Licensing Agreement, which provides that the
9    LICENSOR "reserved" "any rights in and to the WORKS and TRADEMARKS and
10   COPYRIGHTS not expressly granted to the LICENSEE," plainly encompasses
11   not only copyright and trademark ownership, but also ownership of any
12   "works" of the LICENSEE under the Licensing Agreement.

> Ownership rights in a trademark or service mark can be acquired and maintained through the use of the mark by a controlled licensee even when the first and only use of the mark was made, and is being made, by the licensee. This is because use of a designation as a mark by a qualified licensee *inures to the benefit of the licensor, who as a result becomes owner of the trademark* or service mark rights in the designation.

McCarthy on Trademarks, § 18:46 (emphasis added).

> Section 5 of the Lanham Act definitely contemplates that a trade or service mark may be acquired through its use by controlled licensees, even though the registrant itself may not have used the mark.

Turner v. HMH Publ'g Co., 380 F.2d 224, 229 (5th Cir. 1967).  This is what occurred in this case.  Accordingly, Stafford is the lawful owner of the mark ANGELS OF INSPIRATION because UTI's usage of that mark inures to the benefit of Stafford under the Licensing Agreement. Therefore, Stafford is entitled to either have UTI's registration of the mark cancelled or is entitled to an assignment of rights in the mark by UTI to Stafford.

1   UTI's argument that the Licensing Agreement "conferred
2   Stafford's right to create derivative works to UTI" is based upon the
3   contention that an implied covenant can overrule or modify the express
4   terms of the Licensing Agreement.  But it is pellucid that "terms that
5   conflict with an express written contract cannot be implied in a
6   written contract."  <u>Kucharczyk v. Regents of Univ. of Cal.</u>, 946 F.
7   Supp. 1419, 1432 (N.D. Cal. 1996) (citing <u>Tollefson v. Roman Catholic</u>
8   <u>Bishop</u>, 219 Cal. App. 3d 843, 855 (1990)).  Moreover, the integration
9   clause in the Licensing Agreement prevents the use of parol or
10  extrinsic evidence "to vary or contradict the terms of [the]
11  integrated written [Licensing Agreement]."  <u>Traumann v. Southland</u>
12  <u>Corp.</u>, 842 F. Supp. 386, 390 (N.D. Cal. 1993) (citing <u>Masterson v.</u>
13  <u>Sine</u>, 68 Cal. 2d 222 (1968)).  Thus, UTI's indication that an implied
14  agreement overrides the integration clause is unavailing.

> The license must be construed in accordance with
> the purposes underlying federal copyright law.
> Chief among these purposes is the protection of
> the author's rights.  We rely on state law to
> provide the canons of contractual construction,
> but only to the extent such rules do not interfere
> with federal copyright law or policy. . . .
> Copyright licenses are assumed to prohibit any use
> not authorized.

<u>S.O.S., Inc. v. Payday, Inc.</u>, 866 F.2d 1081, 1088 (9th Cir. 1988)
(citations omitted).[4]

Construing the Licensing Agreement in accordance with the
purposes underlying federal copyright law makes it obvious that

---

[4] <u>S.O.S.</u> also cites 17 U.S.C. § 204(a) (stating "transfer of copyright ownership must be in writing.").  As stated in <u>Chamberlain v. Cocola Ass'n.</u>, 958 F.2d 282, 285 (9th Cir. 1992), among "the exclusive rights" the owner of a copyright has is "*to prepare derivative works* based upon copyrighted work. . . ."

Stafford is the lawful owner of the copyrighted polyresin figurines.[5] Nothing in the Licensing Agreement authorized UTI to copyright the figurines. Accordingly, Stafford is granted declaratory relief that Stafford is the sole owner of the copyrights in the figurines, and UTI's copyright registrations are invalid and unenforceable. Therefore, Stafford's partial summary judgment motion for a declaration that the Staffords are the lawful copyright owners of the figurines is granted.

Because of the above rulings, UTI's counterclaims against Stafford for copyright infringement, trademark infringement, false

---

[5] The public policy of California as evidenced in California Civil Code section 988 is in accordance with this holding since that statute indicates that, even in a situation where an ambiguity is present, "any ambiguity with respect to the nature or extent of the rights conveyed shall be resolved in favor of the reservation of rights by the artist or owner, unless in any given case the federal copyright law provides to the contrary." "As a legislative enactment, [a California statute] becomes public policy." English v. Marin Mun. Water Dist., 66 Cal. App. 3d 725, 730 (1977) (overruled on other grounds). When section 988 was construed in Chamberlain, the Ninth Circuit stated in part:

> [W]hen the California statute is read in conjunction with the federal copyright law and the California statute's own legislative history, the most reasonable interpretation of the California statute is that where there is an express, written conveyance of one or more of the limited rights listed in it, there can be no accompanying transfer of ownership unless the transfer of ownership is also in writing.
>
> * * *
>
> California's section 988 simply refines this requirement to direct that there be not merely an agreement, but a written agreement before a transfer of property rights may accompany a transfer of copyright rights.

Chamberlain, 958 F.2d at 285.

14

1  designation of origin, state unfair competition, and declaratory
2  relief are dismissed and UTI's motion for partial summary judgment is
3  denied.  The remaining issues will be tried.
4          IT IS SO ORDERED.
5  Dated:  May 17, 2005

                                /s/ Garland E. Burrell, Jr.
                                GARLAND E. BURRELL, JR.
                                United States District Judge